# United States Court of Appeals
## For the Eighth Circuit

**HAMDI A. MOHAMUD,**

*Plaintiff–Appellant,*

v.

**HEATHER WEYKER, in her individual capacity
as a St. Paul Police Officer,**

*Defendant–Appellee.*

Appeal from the United States District Court
for the District of Minnesota

---

### Appellant Hamdi Mohamud's Brief

---

Patrick Jaicomo
Marie Miller
Anya Bidwell
Dylan Moore
INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Ste. 900
Arlington, VA 22203
(703) 682-9320

Anthony Sanders
INSTITUTE FOR JUSTICE
P.O. Box 315
Lindstrom, MN 55045
(703) 682-9320

*Counsel for Plaintiff-Appellant*

## <u>Summary of the Case</u>

St. Paul, Minnesota, police officer Heather Weyker framed Hamdi Mohamud. At the time, Weyker was cross-deputized with both state and federal authority. The central question here is whether Weyker acted under color of state law. On the facts presented in the separate case of *Yassin v. Weyker*, this Court concluded that Weyker did not. But this case presents a different factual scenario. New allegations, evidence, and arguments provide what was lacking in *Yassin*: a relationship between Weyker's conduct and her duties as a St. Paul police officer.

Ignoring these new facts and arguments, the district court determined that this case merely replays *Yassin*. So it denied as futile Mohamud's motion to file a second amended complaint and granted Weyker summary judgment without permitting discovery. If all that matters is Weyker's cross-deputization, this Court should say so. Otherwise, this Court should reverse the district court's decision because Mohamud—unlike Yassin—has presented facts showing that Weyker leveraged her state authority and position to frame Mohamud.

Given the complexity of the background and the circuit split on a key legal issue, Mohamud requests 30 minutes of oral argument per side.

# Table of Contents

Page

Summary of the Case ..................................................................... i

Table of Authorities ...................................................................... v

Statement of Jurisdiction ............................................................ 1

Statement of the Issues ............................................................... 2

Statement of the Case ................................................................. 3

    Factual Background ................................................................ 11

    I.    Heather Weyker worked exclusively as a St. Paul officer
        when she fabricated the *Adan* cases ................................... 11

        A.    Weyker advanced the *Adan* investigation as a St.
                Paul officer on a St. Paul-led task force. ..................... 12

        B.    Weyker continued working as a St. Paul officer
                after being cross-deputized as a federal marshal ........ 15

        C.    Agreements between the St. Paul Police Depart-
                ment and the federal government reflect a shared
                understanding that cross-deputized officers re-
                main state actors exercising state authority .............. 17

    II.   As an officer with broad state and narrow federal
        authority, Weyker framed Mohamud to protect a
        witness in the *Adan* cases .................................................. 18

    Procedural Background .......................................................... 23

    I.    Weyker has never answered Mohamud's complaint, and
        this Court has already denied Weyker's request for pre-
        discovery qualified immunity. .......................................... 24

II.    On appeal, this Court held that Weyker cannot be sued under *Bivens* but remanded for the district court to consider whether she can be sued under Section 1983. .......26

III.   When Mohamud petitioned the Supreme Court, the U.S. Solicitor General argued that Mohamud might be able to proceed under Section 1983. ...........26

IV.    Despite new facts, evidence, and arguments, the district court denied Mohamud leave to amend her complaint, denied her request for discovery, and granted summary judgment to Weyker in light of *Yassin v. Weyker* ................28

Summary of the Argument .....................................................30

Argument.................................................................................33

I.     This case is not *Yassin v. Weyker* ..........................34

II.    The circuits are split over whether cross-deputized state-federal task force members can act under color of state law. ...........................................................41

       A.    Several circuits have confirmed that state officers on task forces can act under color of state law...........42

       B.    Other circuits are wrong to have applied a categorical rule that cross-deputized officers act under the exclusive color of federal law. .....................44

       C.    This Court's decision in *Yassin* rests on facts beyond Weyker's cross-deputization. ...............46

III.   A person acts under color of state law when her actions are fairly attributable to the state.......................47

       A.    Weyker exercised a right or privilege sourced in state authority when she framed Mohamud. ..............50

       B.    Weyker is a state actor in three ways. ........................54

1. Weyker exercised power traditionally reserved to the state. ..........................................54

2. Weyker's investigation became a joint activity between the St. Paul Police Department and federal government. ................56

3. The Vick Task Force pervasively entwined Weyker's work on the *Adan* cases with the state. ..................................................59

IV. The district court erred by dismissing this case and abused its discretion by denying Mohamud any discovery. ..............................................................65

Conclusion ........................................................................70

Certificate of Compliance........................................................71

Certificate of Service .............................................................72

# Table of Authorities

Page

**Cases**

*Ahmed v. Weyker,*
   984 F.3d 564 (8th Cir. 2020)...................................................... *passim*

*Ahmed v. Weyker,*
   No. 17-CV-2070 (D. Minn.) ................................................. 24

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ........................................................... 66

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) .................................................... 65–66

*Askew v. Bloemker,*
   548 F.2d 673 (7th Cir. 1976) ........................................ 42, 44

*Big Cats of Serenity Springs, Inc. v. Rhodes,*
   843 F.3d 853 (10th Cir. 2016) ...................................... 41, 58

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,*
   403 U.S. 388 (1971) ................................................. 1, 24, 40

*Boes v. Metzinger,*
   No. CIV.08-4180, 2010 WL 11681453 (D.S.D. July 12, 2010) ..... 40, 43

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,*
   531 U.S. 288 (2001) ........................................................... 60

*Bressi v. Ford,*
   575 F.3d 891 (9th Cir. 2009) ........................................ 42–43

*Brownback v. King,*
   592 U.S. 209 (2021) ........................................................... 45

*Burton v. Wilmington Parking Auth.,*
   365 U.S. 715 (1961) ................................................. 47, 56, 61

*Cabrera v. Martin,*
    973 F.2d 735 (9th Cir. 1992) ...................................................... 41, 56

*Clark v. Baka,*
    593 F.3d 712 (8th Cir. 2010) ........................................................... 68

*Couden v. Duffy,*
    446 F.3d 483 (3d Cir. 2006) ........................................................ 42, 43

*Deavers v. Martin,*
    No. 2:21-CV-00423, 2022 WL 551262 (S.D. W. Va. Feb. 23, 2022).... 43

*Doe v. Dardanelle Sch. Dist.,*
    928 F.3d 722 (8th Cir. 2019) ........................................................... 65

*Doe v. N. Homes, Inc.,*
    11 F.4th 633 (8th Cir. 2021) ........................................................... 55

*Edmonson v. Leesville Concrete Co.,*
    500 U.S. 614 (1991) ....................................................................... 55

*Egbert v. Boule,*
    596 U.S. 482 (2022) ....................................................................... 45

*Elgersma v. City of St. Paul,*
    No. 21-CV-1792, 2023 WL 359600 (D. Minn. Jan. 23, 2023) ............. 23

*Evans v. McKay,*
    869 F.2d 1341 (9th Cir. 1989) ......................................................... 47

*Evans v. Newton,*
    382 U.S. 296 (1966) .................................................................. 60, 62

*Farah v. Weyker,*
    926 F.3d 492 (8th Cir. 2019) ......................................................... 3, 25

*Griffin v. Maryland,*
    378 U.S. 130 (1964) ............................................................ 49–50, 58

*Guerrero v. Scarazzini,*
    274 F. App'x 11 (2d Cir. 2008) ........................................... 45

*Hampton v. Hanrahan,*
    600 F.2d 600 (7th Cir. 1979)....................................... 41–42

*Hayes v. Dye,*
    No. CIV.2008-165, 2010 WL 3515578 (E.D. Ky. Sept. 2, 2010) ......... 43

*Hindes v. FDIC,*
    137 F.3d 148 (3d Cir. 1998) .............................................. 41

*In re TMJ Litig.,*
    113 F.3d 1484 (8th Cir. 1997)........................................... 67

*Iverson v. Johnson Gas Appliance Co.,*
    172 F.3d 524 (8th Cir. 1999)............................................ 67

*Jakuttis v. Town of Dracut,*
    95 F.4th 22 (1st Cir. 2024).............................................. 45

*Johnson v. Orr,*
    780 F.2d 386 (3d Cir. 1986) .................................. 43, 59, 61

*King v. United States,*
    917 F.3d 409 (6th Cir. 2019)....................................... 45, 46

*Kletschka v. Driver,*
    411 F.2d 436 (2d Cir. 1969) ........................... 42, 56, 57, 61

*Knights of the KKK v. E. Baton Rouge Par. Sch. Bd.,*
    735 F.2d 895 (5th Cir. 1984)............................................ 41

*Lake Country Ests., Inc. v. Tahoe Reg'l Plan. Agency,*
    440 U.S. 391 (1979)................................................... *passim*

*Lindke v. Freed,*
    601 U.S. 187 (2024)...................................................... 43

*Logsdon v. U.S. Marshal Serv.*,
    91 F.4th 1352 (10th Cir. 2024) ......................................... 45

*Lugar v. Edmonson Oil Co.*,
    457 U.S. 922 (1982) ............................................... 49, 53

*Magee v. Trustees of Hamline Univ.*,
    747 F.3d 532 (8th Cir. 2014) ............................................ 50

*Martin v. Ind. State Police*,
    537 F. Supp. 2d 974 (S.D. Ind. 2008) ................................... 43

*Martinez v. Winner*,
    771 F.2d 424 (10th Cir. 1985) ......................................... 57

*McLeod v. United States*,
    No. 1:20-00595, 2021 WL 5906373 (S.D. Ala. Dec. 14, 2021) ........... 43

*Mohamud v. Weyker*,
    142 S. Ct. 2833 (2022) .............................................. 26, 27

*Mohamud v. Weyker*,
    No. 17-CV-2069, 2018 WL 4469251 (D. Minn. Sept. 18, 2018) .......... 25

*Monroe v. Pape*,
    365 U.S. 167 (1961) ............................................ 48, 49, 50

*Montano v. Hedgepeth*,
    120 F.3d 844 (8th Cir. 1997) ....................................... 48–49

*Murray v. Wal-Mart, Inc.*,
    874 F.2d 555 (8th Cir. 1989) ................................... 56, 57, 58

*NeSmith v. Fulton*,
    615 F.2d 196 (5th Cir. 1980) .......................................... 42

*Olson v. Norman*,
    830 F.2d 811 (8th Cir. 1987) .......................................... 41

*Pony Comput., Inc. v. Equus Comput. Sys., Inc.*,
    162 F.3d 991 (8th Cir. 1998) ............................................................. 68

*Ramirez-Peyro v. Holder*,
    574 F.3d 893 (8th Cir. 2009) ..................................................... 50, 55

*Ray v. Am. Airlines, Inc.*,
    609 F.3d 917 (8th Cir. 2010) ..................................................... 65, 66

*Ricci v. DeStefano*,
    557 U.S. 557 (2009) ........................................................................... 66

*Roberson v. Dakota Boys & Girls Ranch*,
    42 F.4th 924 (8th Cir. 2022) ............................................................. 54

*Sanzone v. Mercy Health*,
    954 F.3d 1031 (8th Cir. 2020) .................................................... 66–67

*Screws v. United States*,
    325 U.S. 91 (1945) ............................................................................ 65

*Smith v. Insley's Inc.*,
    499 F.3d 875 (8th Cir. 2007) ............................................................. 53

*State v. Rangel*,
    No. A06-1410, 2007 WL 2302565 (Minn. Ct. App. 2007) .................. 23

*Strickland v. Shalala*,
    123 F.3d 863 (6th Cir. 1997) ............................................................. 41

*Toben v. Bridgestone Retail Operations, LLC*,
    751 F.3d 888 (8th Cir. 2014) ..................................................... 67, 68

*United States v. Adan*,
    No. 3:10-CR-260 (M.D. Tenn.) ......................................................... 11

*United States v. Burrell*,
    622 F.3d 961 (8th Cir. 2010) ............................................................. 68

*United States v. Classic,*
313 U.S. 299 (1941) ......................................................... 48

*United States v. Colbert,*
172 F.3d 594 (8th Cir. 1999) ...................................... 51–52

*United States v. Fahra,*
643 F. App'x 480 (6th Cir. 2016) ................................. *passim*

*Van Loo v. United States,*
No. 3:23-CV-05618, 2024 WL 3082357 (June 5, 2024) ............... 41, 43

*West v. Atkins,*
487 U.S. 42 (1988) ................................................. 48, 50, 53

*Wickersham v. City of Columbia,*
481 F.3d 591 (8th Cir. 2007) ............................................ 54

*Yassin v. Weyker,*
143 S. Ct. 779 (2023) .................................................... 28

*Yassin v. Weyker,*
39 F.4th 1086 (8th Cir. 2022) ...................................... *passim*

## Statutes and Regulations

28 C.F.R. § 0.112 ..................................................... 16, 59

28 U.S.C. § 1291 .......................................................... 1

28 U.S.C. § 1331 .......................................................... 1

28 U.S.C. § 1343(a) ....................................................... 1

42 U.S.C. § 1983 .................................................... *passim*

## Rules

Fed. R. Civ. P. 12(b)(6) ............................................ 11, 65

Fed. R. Civ. P. 56(a) ............................................ 11, 65, 66

Fed. R. Civ. P. 56(d)....................................................................66

**Other Authorities**

Br. for Resp't in Opp'n, *Mohamud v. Weyker*,
142 S. Ct. 2833 (2022) (No. 21-187)............................................26–27

Br. of Appellant, *Yassin v. Weyker*,
39 F.4th 1086 (8th Cir. 2022) (No. 20-3299) ................................54, 59

James Walsh & David Chanen, *Unlikely pair pursue sex-ring case*,
Star Tribune (Jan. 1, 2011) ..................................................14

Mara H. Gottfried, *How 2 St. Paul cops helped crack alleged sex-trafficking ring*, St. Paul Pioneer Press (Nov. 13, 2010)........12–14, 16

Pet. for Cert., *Mohamud v. Weyker*,
142 S. Ct. 2833 (2022) (No. 21-187)......................................26

Reply Br. of Appellant, *Yassin v. Weyker*,
39 F.4th 1086 (8th Cir. 2022) (No. 20-3299) .....................................62

## Statement of Jurisdiction

Plaintiff-Appellant Hamdi Mohamud brought this action under 42 U.S.C. § 1983 and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), alleging violations of her Fourth Amendment rights. App. 10, 25; R. Docs. 11, 76. The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). It entered a final judgment dismissing all claims on March 26, 2024. App. 237; R. Doc. 91. On April 23, 2024, Mohamud timely appealed. App. 9. This Court has jurisdiction under 28 U.S.C. § 1291.

## Statement of the Issues

1.    Whether the district court erred in denying as futile Mohamud's motion for leave to file a second amended complaint.

2.    Whether the district court erred in granting Weyker's alternative motion for summary judgment—especially in light of the district court's refusal to allow Mohamud even limited discovery.

**Most apposite cases for both issues:**

*Yassin v. Weyker*, 39 F.4th 1086 (8th Cir. 2022);

*Ahmed v. Weyker*, 984 F.3d 564 (8th Cir. 2020);

*Lugar v. Edmonson Oil Co.*, 457 U.S. 922 (1982);

*Lake Country Ests., Inc. v. Tahoe Reg'l Plan. Agency*,
        440 U.S. 391 (1979).

## Statement of the Case

This Court is well acquainted with the parties to this case. *See Yassin v. Weyker*, 39 F.4th 1086 (8th Cir. 2022); *Ahmed v. Weyker*, 984 F.3d 564 (8th Cir. 2020); *Farah v. Weyker*, 926 F.3d 492 (8th Cir. 2019); *see also United States v. Fahra*, 643 F. App'x 480 (6th Cir. 2016). To protect a witness in Weyker's sham investigation of a sex-trafficking ring, Weyker framed Mohamud and her two friends, Ifrah Yassin and Hawo Ahmed, "landing them in jail through lies and manipulation." *Ahmed*, 984 F.3d at 565.

When the Court last considered this case, it held that a *Bivens* cause of action is unavailable against Weyker for her actions under color of federal law. *Id.* at 571. But the Court cautioned: "Just because a *Bivens* remedy is off the table does not mean [Mohamud's case is] over. If the district court determines on remand that Weyker was acting under color of *state* law, [Mohamud's] claims may proceed[.]" *Id.*

Before the district court could, however, this Court decided Yassin's case, clarifying the legal standard for assessing color of state law. This Court held that, under the facts and evidence adduced in *Yassin*, Section 1983 was unavailable to Yassin because she presented no "actual or

purported relationship between [Weyker's] conduct and [her] duties as a [St. Paul] police officer." *Yassin*, 39 F.4th at 1091. *Yassin* rested on four key facts:

1. "State law had nothing to do with 'the nature and circumstances' of Weyker's conduct." *Id.* at 1090.

2. "[T]he witness [Weyker] was trying to protect, Muna Abdulkadir, was only on her radar because [Weyker] was assigned to a federal investigation." *Id.*

3. Weyker did not stray from the "performance of [her] official duties" when she convinced Minneapolis police at the scene to arrest Yassin, Ahmed, and Mohamud because she "was tasked with 'investigative work on the [sex-trafficking] task force[]'" and was "trying to keep a federal witness out of trouble." *Id.* at 1090–91.

4. Weyker "acted within the scope of her federal duties while dealing with the situation." *Id.* at 1091.

On remand, Weyker moved for summary judgment in light of *Yassin*, while Mohamud moved for leave to amend her complaint in light of *Yassin* and newly discovered evidence. App. 7–8. Mohamud submitted

both a proposed Second Amended Complaint, App. 25–102; R. Doc. 76, and a Declaration in support of discovery under Rule 56(d), App. 103–211; R. Doc. 81. She included factual allegations and documents proving the direct relationship between Weyker's actions and her duties as a St. Paul officer.

Of note, Mohamud unearthed several memoranda of understanding governing task forces between the St. Paul Police Department and the federal government. These memoranda had never been presented to this Court or the district court—not here, nor in Ahmed's or Yassin's cases. Along with Mohamud's new factual allegations, the memoranda make clear that the key facts in *Yassin* are absent (and that opposite facts govern) here:

1. State law had everything to do with the nature and circumstances of Weyker's conduct because Weyker's investigation was part of her work as a St. Paul police officer on the "Gerald D. Vick Human Trafficking Task Force of Minnesota." "The Saint Paul Police Department (SPPD) is the lead agency" running the Vick Task Force and does so with the mission of "combat[ing] domestic

and international human trafficking when it appears in Minnesota."



**Gerald D. Vick Human Trafficking Task Force**

**Memorandum of Understanding**

**Mission Statement:** The goals of the Gerald D. Vick Human Trafficking Task Force (Task Force) of Minnesota are to foster communication among local, state and federal law enforcement agencies working together with organizations providing comprehensive services to trafficking victims; identify and rescue victims of human trafficking; and combat domestic and international human trafficking when it appears in Minnesota.

The Saint Paul Police Department (SPPD) is the lead agency in the establishment and continuance of the Human Trafficking Task Force (HTTF). Each member agency agrees to support the overall mission of the HTTF to identify and assist victims of human

App. 43–45, 58–62; R. Doc. 76, at 19–21, 34–38.

2. The witness Weyker was trying to protect, Muna Abdulkadir, was on Weyker's radar long before there was any ostensible "federal investigation" and long before Weyker's 2010 cross-deputization.



Saint Paul Police Department       Page 1 of 9

**SUPPLEMENTAL OFFENSE / INCIDENT REPORT**

Complaint Number    Reference CN               Date and Time of Report

044622                       11/01/2009 16:50:00

Primary offense:

INVESTIGATE-AND ALL OTHER

---

Primary Reporting Officer: Weyker, Heather L       Name of location/business:

Primary squad:                          Location of Incident: 367 GROVE ST

Secondary reporting officer:                       ST PAUL, MN 55101

Approver:

District: Eastern           Date & time of occurrence: 03/13/2008 21:10:00 to

Site:                                      03/13/2008 21:10:00

Arrest made:

Secondary offense:

---

Police Officer Assaulted or Injured:          Police Officer Assisted Suicide:

Crime Scene Processed:

**NARRATIVE**

On 10-26-09, I, Ofcr Heather Weyker, Sgt John Bandemer, FBI S/A Nick Pottratz responded to 8660 Franlo Road, Eden Prairie, MN 55344, to speak with Muna Mohamud Abdulkadir, (known throughout report at Muna) ████-93, SS# ████-4315, and to serve her with a grand jury subpoena for 11-04-09. Note on her SS card it read Muna Abduqadir. Muna stated they spelled her name wrong on the SS card, but the number was what she used.

App. 45; R. Doc. 76, at 21.

3. Weyker was performing official St. Paul duties and using her po-
sition as a St. Paul police officer—not her narrow federal author-
ity—when she intervened into a state-law investigation to have
Mohamud arrested for a state-law crime. *See* App. 33, 40–41; R.
Doc. 76, at 9, 16–17. In her affidavit charging Mohamud, Weyker
explained that the St. Paul Police Department had assigned her
to work on "a federally funded human trafficking task force."

## AFFIDAVIT

Your affiant is a Police Officer with the St. Paul Police Department and has been employed there for the last 12 years and is also Federal Bureau of Investigation Task Force Officer. Your affiant is currently assigned to the Vice Unit and is part of a federally funded human trafficking task force which investigates human trafficking crimes and other related crimes such as drugs, fraud and smuggling. On June 16, 2011, your affiant became involved in the investigation of an assault of a federal witness who will be referred to by her initials as M.A. in this affidavit. The facts known to me in this affidavit are derived from my participation in the investigation as well as information received by other officers and or federal agents.

App. 49; R. Doc. 76, at 25; *see also* App. 128–68; R. Doc. 81-2, at 47–87 (Vick Task Force Budget and Proposal for Supplemental Funding). With new context provided by the memorandum, it's now clear that the "human trafficking task force" was the Vick Task Force of Minnesota led by the St. Paul Police Department.

4. Weyker acted beyond the scope of her limited federal duties, and, in any case, was simultaneously acting within the scope of her St. Paul duties. Weyker's deputization form limited her federal authority "[t]o seek[ing] and execut[ing] arrest and search warrants supporting a federal task force." App. 47; R. Doc. 76, at 23. She was doing neither when she framed Mohamud.

Mohamud's new evidence also introduces a new and persuasive fact that was unavailable to the Court in *Yassin*:

5.  Contemporaneous agreements between St. Paul and the federal government prove that both entities understood cross-deputized officers like Weyker to act under color of state law. These agreements provide:

*Minneapolis Joint Terrorism Task Force (2005)*

> Liability for violations of federal constitutional law rests with the individual federal agent or officer pursuant to <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971) or pursuant to 42 U.S.C. Section 1983 for state and local officers or cross-deputized federal officers.

*Minnesota Cyber Crime Task Force (2011)*

> <u>Bivens Actions.</u> Liability for violations of federal constitutional law rests with the individual Federal agent or officer, or employee, pursuant to <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971) or pursuant to 42 U.S.C. § 1983 for State and local officers or cross-deputized Federal officers.

App. 48–49, 67, 97; R. Doc. 76, at 24–25, 43, 73.

The new allegations and evidence in Mohamud's case confirm a "relationship between [Weyker's] conduct and [her] duties as a [St. Paul] police officer." *Yassin*, 39 F.4th at 1091. "[B]ut for Weyker holding herself out as a St. Paul police officer," App. 42; R. Doc. 76, at 18, Mohamud's rights would not have been violated. *See also* App. 40–41; R. Doc. 76, at 16–17 ("Had Weyker not used her position as a St. Paul Police Officer

to inject herself into the Minneapolis Police Department's investigation of a purely local crime . . . the Minneapolis Police would not have detained, seized, or arrested Plaintiff[.]"). Thus, under *Yassin*'s reasoning, Mohamud's claim under Section 1983 should proceed.

Still, the district court concluded—without explanation or analysis—that "[t]he allegations of Mohamud's proposed Second Amended Complaint do not yield a conclusion that differs from the one reached by the Eighth Circuit in *Yassin*." App. 226; R. Doc. 90, at 15. That holding would be correct if *Yassin* had held that the only material fact was Weyker's cross-deputization. But *Yassin* did not adopt a blanket rule that cross-deputized task force members never act under color of state law. Instead, this Court relied on other facts, the opposite of which exist here. So the district court's decision is wrong.

A faithful application of *Yassin*'s reasoning to Mohamud's new allegations, evidence, and arguments shows that Weyker acted under color of state law and is thus liable under Section 1983, even if she simultaneously acted under color of federal law.

# Factual Background[1]

## I. Heather Weyker worked exclusively as a St. Paul officer when she fabricated the *Adan* cases.

In 2008, Weyker began a doomed investigation into a fictitious crime ring that would result in criminal cases against thirty people—nearly all Minnesota residents (the "*Adan* cases"[2]). *Ahmed*, 984 F.3d at 565; *Fahra*, 643 F. App'x at 481–83, 484 (*e.g.*, "[B]ased on our painstaking review of the record . . . this story of sex trafficking and prostitution may be fictitious[.]"). None were convicted, and reviewing courts noted Weyker's chronic dishonesty.[3]

---

[1] Whether considered under Rule 12 or Rule 56, the facts of this pre-discovery appeal are the same. *See infra* Argument Part IV. For the sake of brevity, Mohamud primarily cites her Second Amended Complaint, App. 25; R. Doc. 76, but the same facts are also embraced in the summary-judgment record—through the Second Amended Complaint, itself, and the Declaration supporting Mohamud's Rule 56(d) request for discovery, App. 103; R. Doc. 81.

[2] *See United States v. Adan*, No. 3:10-CR-260 (M.D. Tenn.), *et al.*

[3] The Sixth Circuit explained in *Fahra*, for example:

> The district court opined that Officer Weyker likely exaggerated or fabricated aspects of this story, noting (among other inconsistencies) that Weyker's final reports frequently referred to sex for money while that assertion was conspicuously absent from her handwritten notes . . . Weyker had misstated facts in the reports, adding to and omitting things from her

## A. Weyker advanced the *Adan* investigation as a St. Paul officer on a St. Paul-led task force.

Before she was cross-deputized, Weyker led the *Adan* investigation strictly as a St. Paul member of the Gerald D. Vick Human Trafficking Task Force of Minnesota. This task force's stated mission was to "combat . . . human trafficking when it appears in Minnesota":

<div style="border:1px solid">

**Gerald D. Vick Human Trafficking Task Force**

**Memorandum of Understanding**

**Mission Statement: The goals of the Gerald D. Vick Human Trafficking Task Force (Task Force) of Minnesota are to foster communication among local, state and federal law enforcement agencies working together with organizations providing comprehensive services to trafficking victims; identify and rescue victims of human trafficking; and combat domestic and international human trafficking when it appears in Minnesota.**

</div>

App. 44, 59; R. Doc. 76, at 20, 35. "The St. Paul Police Department (SPPD) is the lead agency" for the Vick Task Force. *Id.* Weyker and St. Paul Sergeant John Bandemer received support from two rotating federal officers. App. 44–45; R. Doc. 76, at 20–21; *see also* Mara H. Gottfried, *How 2 St.*

---

statements. Elsewhere, the district court caught Weyker lying to the grand jury and, later, lying during a detention hearing . . . . Weyker also lied on an application . . . and endors[ed] the validity of a forged birth certificate.

643 F. App'x at 482.

*Paul cops helped crack alleged sex-trafficking ring*, St. Paul Pioneer Press (Nov. 13, 2010); App. 111–112; R. Doc. 81, at 9–10.

In 2009, while still working exclusively as a St. Paul police officer (without cross-deputization), Weyker met Muna Abdulkadir and began cultivating her as a witness for the St. Paul Police Department. App. 45; R. Doc. 76, at 21.



App. 170; R. Doc. 81-2, at 89 (St. Paul Police Department Incident Report).

Around the same time, the Vick Task Force asked its partners at the Minnesota U.S. Attorney's Office to bring charges in the *Adan* cases, but the U.S. Attorney declined because the evidence "supported a state prosecution, but not a federal case."[4] App. 45; R. Doc. 76, at 21; James Walsh & David Chanen, *Unlikely pair pursue sex-ring case*, Star Tribune (Jan. 1, 2011). Undeterred, Weyker continued her investigation into the *Adan* cases as part of her work on the Vick Task Force.

The investigation eventually grew until, as Weyker put it in a news article, the Vick Task Force "required a lot more resources, and hence the dual-state effort." App. 45; R. Doc. 76, at 21; Gottfried, *supra.* So in 2010 the Vick Task Force began working with another group of state and federal agencies (the "ad hoc task force"): the Minneapolis Police

---

[4] This should satisfy the Sixth Circuit's "curio[sity]" about why, despite the ubiquitously Minnesotan character of the investigation, "the federal prosecutor in Minnesota did not prosecute the case in Minnesota." *Fahra*, 643 F. App'x at 482 (noting that "Officer Weyker (the lead agent), . . . the principal victim-witness[], and all but a few of the 30 defendants reside[d] in Minnesota, and an overwhelming portion of the events at issue occurred in Minnesota").

Department, U.S. Department of Homeland Security, Tennessee Bureau of Investigation, and U.S. Secret Service.[5] App. 45–46; R. Doc. 76, at 21–22.

## B. Weyker continued working as a St. Paul officer after being cross-deputized as a federal marshal.

After the Vick Task Force and ad hoc task force began working together on Weyker's investigation, she was cross-deputized as a Special Deputy U.S. Marshal (sponsored by the FBI) on August 24, 2010. App. 46; R. Doc. 76, at 22. Cross-deputization imbued Weyker with limited federal authority that added to, but did not displace, her authority under Minnesota law.

As the one-page Special Deputization Appointment form explained, Weyker's employer remained the "St. Paul Police Department" and Weyker's "appointment d[id] not constitute employment by the United States

---

[5] Despite the shorthand, "ad hoc task force," Mohamud disputes that the group it represents was a formal "task force" as that phrase is commonly understood. Nothing in the record indicates that the ad hoc task force was more than a group of agencies and agents informally working together. And, unlike, *e.g.*, the Vick Task Force, Minneapolis Joint Terrorism Task Force, and Minnesota Cyber Crimes Task Force, *see* App. 57–102; R. Doc. 76, at 33–78, no memorandum of understanding outlining the relevant relationships and governance for the ad hoc task force exists.

Marshals Service, the United States Department of Justice, or the United States Government." App. 46; R. Doc. 76, at 22. Moreover, Weyker agreed she was "neither entering into an employment agreement with the Federal Government or any element thereof, nor being appointed to any position in the Federal Service by virtue of this special deputation." *Id.* The form also shows that Weyker's federal authority was narrow. Of six checkboxes available to grant her specific federal authority as a cross-deputized officer, only one was checked: "To seek and execute arrest and search warrants supporting a federal task force." App. 47; R. Doc. 76, at 23.

Under federal law, Weyker was eligible for cross-deputization only because she was a local law enforcement officer. 28 C.F.R. § 0.112. Without state-law authority, she could not have exercised any authority under color of federal law.

Even so, after her cross-deputization Weyker remained a St. Paul officer and continued leading the same St. Paul investigation she had been spearheading for years. App. 48–50; R. Doc. 76, at 24–26. Indeed, St. Paul Sergeant Bandemer supervised Weyker on the Vick Task Force both before and after she was cross-deputized. Gottfried, *supra.*

**C.**   **Agreements between the St. Paul Police Department and the federal government reflect a shared understanding that cross-deputized officers remain state actors exercising state authority.**

Confirming Weyker's state color, Mohamud recently uncovered documents outlining the standard operating procedures and customs for state-federal task force work conducted by the St. Paul Police Department. App. 47–48, 63–102; R. Doc. 76, at 23–24, 39–78. These agreements explicitly recognize that cross-deputized officers can and do exercise state authority, function as state actors, and are, therefore, subject to liability under 42 U.S.C. § 1983. *Id.*

For example, a 2005 memorandum of understanding between the St. Paul Police Department and FBI governing the Minneapolis Joint Terrorism Task Force provides:

> Liability for violations of federal constitutional law rests with the individual federal agent or officer pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) or pursuant to 42 U.S.C. Section 1983 for state and local officers or cross-deputized federal officers.

App. 67; R. Doc. 76, at 43. And the standard operating procedures governing the Minnesota Cyber Crime Task Force in 2011 contain a nearly identical provision:

> <u>Bivens Actions.</u>  Liability for violations of federal constitutional law rests with the individual Federal agent or officer, or employee, pursuant to <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,</u> 403 U.S. 388 (1971) or pursuant to 42 U.S.C. § 1983 for State and local officers or cross-deputized Federal officers.

App. 97; R. Doc. 76, at 73.

Taken together, these documents prove that before, during, and after Weyker's cross-deputization, St. Paul and the federal government understood that cross-deputized officers use their state authority when working on state-federal task forces and that cross-deputized officers are thus subject to liability under Section 1983. *See* App. 57–102; R. Doc. 76, at 33–78. The Vick Task Force memorandum makes state authority even clearer here. After all, it governs the Gerald D. Vick Human Trafficking Task Force *of Minnesota* for which the St. Paul Police Department is the lead agency.

## II. As an officer with broad state and narrow federal authority, Weyker framed Mohamud to protect a witness in the *Adan* cases.

Mohamud was not involved in the *Adan* cases. App. 27; R. Doc. 76, at 3. She and her friends Hawo Ahmed and Ifrah Yassin were "[p]erhaps the most accidental of participants" in Weyker's scheme. *Yassin*, 39 F.4th at 1088. On June 16, 2011, the girls had the misfortune of being attacked by the witness Weyker had been cultivating since 2009—Muna

Abdulkadir. After the attack, the girls called 911 for help. App. 30–31; R. Doc. 76, at 6–7. Minneapolis police officer Anthijuan Beeks responded to the 911 call. App. 32; R. Doc. 76, at 8. When he arrived on the scene, Beeks regarded Mohamud and her friends as the victims of a local crime committed by Abdulkadir. *See* App. 34; R. Doc. 76, at 10. He had no reason to suspect that Mohamud or her friends had sought to harm, threaten, or intimidate Abdulkadir because she was a witness in a federal case. Indeed, he had no reason to suspect that Mohamud had committed any crime at all. App. 32; R. Doc. 76, at 8.

While Mohamud and her friends called 911, Abdulkadir fled and made a call of her own to Weyker, telling Weyker that she had been in a fight, had attacked Mohamud and her friends with a knife, was hiding in a neighbor's apartment, and feared she would be arrested. App. 31–32; R. Doc. 76, at 7–8.

"Worried about the possibility of losing a witness, Weyker sprang into action." *Ahmed*, 984 F.3d at 566; *see also* App. 30–31, 35; R. Doc. 76, at 6–7, 11. Using her Minnesota credentials and specialized knowledge of local policing, Weyker changed the scenario by quickly injecting herself into Beeks's state-law investigation. Weyker contacted Minneapolis

police dispatch and, by identifying herself as a St. Paul officer, was put in touch with officers on the scene. App. 33; R. Doc. 76, at 9. Beeks learned that he had an urgent message on the computer in his patrol vehicle: "OFFICER HEATHER WEYKER 710 out of St. Paul would like Officers to call her ASAP at [a given phone number]." App. 32; R. Doc. 76, at 8.

Beeks immediately called Weyker. She told him that she had "information and documentation" that Mohamud and her friends "had been actively seeking out [Abdulkadir] and attempting to intimidate [her] or cause bodily harm" for cooperating in a federal investigation, and that one of the girls was dating a suspect in the investigation. App. 33; R. Doc. 76, at 9. Holding herself out as a St. Paul officer "on special assignment with the FBI in Tennessee," Weyker made similar statements to another Minneapolis police officer, Sergeant Gary Manty, who was also on the scene. App. 35–36; R. Doc. 76, at 11–12.

But Weyker was lying. She "had no 'information' or 'documentation'"; she just wanted to shield Abdulkadir from arrest to encourage her continued participation in the *Adan* cases. App. 33–34, 36, 40; R. Doc. 76, at 9–10, 12, 16. Weyker's plan worked—at least as far as she sought to

have Mohamud and her friends locked up. Based on Weyker's intentional misrepresentations, Beeks arrested Mohamud and her friends for witness tampering under Minnesota law. App. 40–42; R. Doc. 76, at 16–18. Had Weyker not leveraged her position as a St. Paul police officer to contact Beeks and Manty and persuade them to change the focus of their investigation, Mohamud and her friends would not have been arrested. *Id.*

Weyker then documented her actions in a St. Paul police report, which she emailed to Manty. App. 36–40; R. Doc. 76, at 12–16. In the report, Weyker fabricated facts, knowingly related false information, and withheld exculpatory facts, all with the intention that Mohamud and her friends would continue being seized and detained for crimes that Weyker knew were unsupported by even arguable probable cause. *Id.*

The next day, Weyker doubled down to frame Mohamud and her friends. Listing her official title as "FBI TFO/ST PAUL PD," Weyker swore out a federal criminal complaint and supporting affidavit against the friends for tampering with a federal witness and obstructing the *Adan* investigation. In her affidavit, Weyker carried over the false and misleading information she had included in her St. Paul report. App. 41–

42; R. Doc. 76, at 17–18. Weyker's affidavit also confirmed the state nature of her investigation—that it began and continued through the St. Paul-led Vick Task Force of Minnesota:



AFFIDAVIT

Your affiant is a Police Officer with the St. Paul Police Department and has been employed there for the last 12 years and is also Federal Bureau of Investigation Task Force Officer. Your affiant is currently assigned to the Vice Unit and is part of a federally funded human trafficking task force which investigates human trafficking crimes and other related crimes such as drugs, fraud and smuggling. On June 16, 2011, your affiant became involved in the investigation of an assault of a federal witness who will be referred to by her initials as M.A. in this affidavit. The facts known to me in this affidavit are derived from my participation in the investigation as well as information received by other officers and or federal agents.

App. 49; R. Doc. 76, at 25; *see also* App. 109–113; R. Doc. 81, at 6–10; App. 128–68; R. Doc. 81-2, at 47–87 (further establishing that the Vick Task Force is the "federally funded human trafficking task force" to which Weyker referred).

With her criminal complaint and affidavit, Weyker's frame-up was accomplished. Before the dismissal of all charges against her, Mohamud—a minor—spent nearly 25 months in federal custody, facing a potential sentence of life in prison. App. 42–43; R. Doc. 76, at 18–19. A

jury acquitted both Ahmed and Yassin at trial. *Yassin*, 39 F.4th at 1088; *Ahmed*, 984 F.3d at 566. The *Adan* cases met a similar fate. "[P]lagued with problems from the start," only nine of the 30 people indicted were tried. *Ahmed*, 984 F.3d at 565. Each was acquitted. *Id.* And after a "painstaking review of the record," the Sixth Circuit concluded that Weyker's tale "of sex trafficking and prostitution" was "likely a fictitious story" that Weyker advanced through a campaign of lies and deceit. *Fahra*, 643 F. App'x at 484.

It was neither the first nor the last time a judge would remark on Weyker's fraught relationship with the truth.[6]

## **Procedural Background**

Mohamud was released from prison and Weyker's investigation collapsed. Mohamud then sued Weyker on June 15, 2017. Since then,

---

[6] *See Elgersma v. City of St. Paul*, No. 21-CV-1792, 2023 WL 359600, at *2 (D. Minn. Jan. 23, 2023) (granting summary judgment against Officer Weyker for searching a man's apartment without a warrant after deceiving him to open the door, even though "Weyker . . . acknowledged in [her] deposition[] that [she] knew that without consent or exigent circumstances, it was unlawful to enter someone's apartment without a warrant"); *State v. Rangel*, No. A06-1410, 2007 WL 2302565, at *6 (Minn. Ct. App. 2007) (Wright, J., dissenting) (sardonically noting that, "according to Officer Weyker, after having his consent [to search his apartment], Rangel performed the remarkable feat of retrieving the keys while handcuffed").

Mohamud has been "trying to hold a rogue law-enforcement officer responsible for landing [her] in jail through lies and manipulation." *Ahmed*, 984 F.3d at 565. Mohamud alleges two claims for damages based on the Fourth Amendment: one under 42 U.S.C. § 1983 for Weyker's actions under color of state law, and one under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), for Weyker's actions under color of federal law.

Although this case has been pending for more than seven years, it is still in its formative stages. Weyker has never answered Mohamud's complaint, and the parties have neither participated in a Rule 26(f) conference, nor exchanged initial disclosures, nor engaged in any discovery.

## I. Weyker has never answered Mohamud's complaint, and this Court has already denied Weyker's request for pre-discovery qualified immunity.

In 2017, Weyker responded to Mohamud's first amended complaint with a consolidated motion to dismiss in this case and a related one brought by Mohamud's friend, Hawo Ahmed (*Ahmed v. Weyker*, No. 17-CV-2070 (D. Minn.)). Weyker argued that probable cause existed to arrest and prosecute Mohamud and her friends, that Weyker is entitled to

qualified immunity, and that no cause of action exists against her under Section 1983 or *Bivens*.

The district court denied Weyker's motion. Without deciding whether Section 1983 or *Bivens* was a proper vehicle for Mohamud's claims, the court held that Weyker was not entitled to qualified immunity. *Mohamud v. Weyker*, No. 17-CV-2069, 2018 WL 4469251, at *3–5 (D. Minn. Sept. 18, 2018). That's because the law is clearly established that "a seizure without 'a truthful factual showing sufficient to constitute probable cause' violates the Fourth Amendment," *id.* at *4 (quoting *Livers v. Schenck*, 700 F.3d 340, 357 (8th Cir. 2012)), and nothing in Beeks's investigation, "except the allegedly false information conveyed to him by Weyker, led him to believe that . . . Mohamud had engaged in any criminal activity," *id.* at *5.

Weyker filed an interlocutory appeal. This Court did not disturb the district court's qualified-immunity holding. After all, this Court had decided in Yassin's case that qualified immunity does not shield Weyker because "a reasonable officer would know that deliberately misleading another officer into arresting an innocent individual to protect a sham investigation is unlawful." *Farah*, 926 F.3d at 503.

**II. On appeal, this Court held that Weyker cannot be sued under *Bivens* but remanded for the district court to consider whether she can be sued under Section 1983.**

This Court resolved Weyker's appeal by holding that no cause of action was available under *Bivens* for Weyker's actions taken under color of federal law. *Ahmed*, 984 F.3d at 568–69. The Court vacated and remanded for the district court to dismiss Mohamud's *Bivens* claim. But the Court softened the harsh result: "Just because a *Bivens* remedy is off the table does not mean [Mohamud's case is] over. If the district court determines on remand that Weyker was acting under color of *state* law," Mohamud's Section 1983 claim may proceed. *Ahmed*, 984 F.3d at 571.

**III. When Mohamud petitioned the Supreme Court, the U.S. Solicitor General argued that Mohamud might be able to proceed under Section 1983.**

Before litigating the Section 1983 issue on remand, Mohamud petitioned the Supreme Court for certiorari on the *Bivens* issue. *See generally* Pet. for Cert., *Mohamud v. Weyker*, 142 S. Ct. 2833 (2022) (No. 21-187). The U.S. Solicitor General—representing Weyker—persuaded the Supreme Court not to hear the case yet, explaining that this Court "remanded the case to permit the district court to determine whether respondent was acting under color of state law, which might permit

petitioner's constitutional claim to proceed under Section 1983." Br. for Resp't in Opp'n at 20, *Mohamud v. Weyker*, 142 S. Ct. 2833 (2022) (No. 21-187). On that basis, the Solicitor General urged the Supreme Court to wait before deciding whether to review the *Bivens* question:

> If the district court finds that petitioner's Fourth Amendment claim cannot proceed under Section 1983, and if that determination is upheld in any subsequent appeal, petitioner will be able to raise her [*Bivens*] claim, together with any other claims that may arise in those subsequent proceedings, in a single petition for a writ of certiorari.

*Id.* at 21. The Supreme Court denied certiorari.[7] *Mohamud v. Weyker*, 142 S. Ct. 2833 (2022) (mem.).

By that time, the parties had already jointly moved to stay proceedings pending this Court's decision in *Yassin v. Weyker*. There, this Court considered the facts and arguments marshalled in Ifrah Yassin's case and concluded that they did not establish Weyker acted under color of state law. 39 F.4th at 1091 (finding no "actual or purported relationship between [Weyker's] conduct and [her] duties as a [St. Paul] police officer"

---

[7] We preserve for certiorari the issue of whether Mohamud's Fourth Amendment claims against Weyker can proceed under *Bivens*.

(citation omitted)). Once the Supreme Court denied certiorari in *Yassin v. Weyker*, 143 S. Ct. 779 (2023) (mem.), this case resumed.

On the Solicitor General's and this Court's invitations, Mohamud returned to the district court and asked it to address whether Weyker was subject to liability under Section 1983. In support of her position that Weyker had acted under color of state law given this Court's reasoning in *Yassin*, Mohamud offered new factual allegations, evidence, and arguments. These included newly discovered memoranda of understanding confirming the state nature of Weyker's work on the Vick Task Force of Minnesota and the shared understanding of St. Paul and the federal government that cross-deputized officers like Weyker use state-law authority and thus act under color of state law.

## IV. Despite new facts, evidence, and arguments, the district court denied Mohamud leave to amend her complaint, denied her request for discovery, and granted summary judgment to Weyker in light of *Yassin v. Weyker*.

When this case picked back up, the parties simultaneously filed cross motions. Weyker moved to dismiss or, in the alternative, for summary judgment in light of *Yassin*. App. 7–8 (submitting 19 exhibits and 2 declarations from outside the pleadings). Mohamud moved to amend her complaint in light of *Yassin* and newly discovered factual

information. Based on the same information in her proposed Second Amended Complaint, Mohamud also requested limited discovery under Rule 56(d). *Id.* at 8. In sum, Mohamud's new allegations presented a case very different from *Yassin*.

The district court, nevertheless, granted Weyker's motion, denied Mohamud's, and dismissed the case. The district court held that Mohamud's proposed Second Amended Complaint was futile, but the court's order did little more than quote the parties' briefing and cite *Yassin*. In the district court's view, because *Yassin* had held that "[s]tate law had nothing to do with 'the nature or circumstances' of Weyker's conduct," App. 225–26; R. Doc. 9, at 14–15, Mohamud's Second Amended Complaint could not state a claim. The district court then granted summary judgment to Weyker for the same reason,[8] App. 231–33; R. Doc. 90, at 20–22, and denied Mohamud's Rule 56(d) request for limited discovery, App. 235; R. Doc. 90, at 24.

This appeal follows.

---

[8] Although the district court treated Officer Weyker's motion as one for summary judgment, not to dismiss, it nowhere explained why or what documents outside of Mohamud's pleadings it considered. App. 229; R. Doc. 90, at 18.

## Summary of the Argument

As a cross-deputized St. Paul police officer with state and federal authority, Weyker acted or purported to act under color of both state and federal law. In holding that Weyker acted exclusively under color of federal law—thereby completely insulating her from all constitutional accountability—the district court concluded that this case was a mere replay of *Yassin v. Weyker*. But the district court is wrong on both the law and the facts:

*On the law*, this Court's analysis in *Yassin* indicates that cross-deputized task force officers can act under color of state law. *See infra* Parts I & II(C). Indeed, Section 1983 itself provides liability for "[e]very person" who violates the Constitution under color of state law. 42 U.S.C. § 1983. The statute hinges on *any* state color; it need not be exclusive or even primary. Accordingly, the Supreme Court and multiple circuits have held that federal officers with far more federal authority than a cross-deputized city police officer can act under color of state law. *See infra* Part III. And several circuits have applied this standard to cross-deputized task force officers (though others have rejected it). *See infra* Part II(A)–(C).

The district court failed to reckon with this body of law, causing it to disregard key differences between this case and *Yassin*.

*On the facts*, Weyker acted under color of state law because she exercised state privileges as a state actor. In particular, the new allegations in Mohamud's Second Amended Complaint and three task force agreements confirm that all of Weyker's actions ran through the St. Paul-led Vick Task Force of Minnesota and that the St. Paul Police Department, the federal government, and Weyker, herself, understood Weyker to be a state actor exercising—or purporting to exercise—state privileges under color of state law, even after she was cross-deputized. Indeed, Weyker could not have deprived Mohamud of her rights were she not clothed with state authority. This case presents a dramatically different factual landscape than the one the Court navigated in *Yassin*, and it leads to a different conclusion.

This Court should reverse the district court's decision below and allow Mohamud's meritorious constitutional claims to proceed. On the other hand, if all that matters is Weyker's cross-deputization, then this Court should say so and directly confront the circuit split over whether

cross-deputization effectively immunizes local police from constitutional accountability. *See infra* Part II.

## Argument

The central question here is whether Weyker, a cross-deputized St. Paul police officer, acted under *any* color of state law when she violated Mohamud's Fourth Amendment rights. Because Weyker's actions and authority are attributable to St. Paul, Minnesota, she did. Weyker is not beyond Section 1983's reach simply because some of her actions were taken under color of state and federal law simultaneously. Unlike in *Yassin*, where "[s]tate law had nothing to do with the nature and circumstances of Weyker's conduct," 39 F.4th at 1090, Mohamud's allegations and evidence prove that state law had *everything* to do with the nature and circumstances of that conduct.

Mohamud's argument proceeds in four parts. *First*, we explain how Mohamud's allegations and evidence distinguish this case from *Yassin*. *Second*, we address the circuit split over whether task force membership and cross-deputization exclude color of state law and where *Yassin* falls in the split. *Third*, we discuss the law governing whether a person acts under color of state law. *Fourth*, we address how the district court erred by granting Weyker summary judgment and denying Mohamud leave to

amend; and, alternatively, abused its discretion by denying Mohamud discovery.

## I. This case is not *Yassin v. Weyker.*

Contrary to the district court's conclusion, App. 226; R. Doc. 90, at 15, the allegations and evidence Mohamud has provided tell a very different story than the one this Court heard in *Yassin*.[9] There, the Court found no relationship between Weyker's conduct and her St. Paul duties. 39 F.4th at 1091. But, thanks to Mohamud's new allegations and evidence, we now know that's not true.

Compare the following statements from *Yassin* to the allegations and evidence here:

- In <u>*Yassin*</u>, the Court reasoned that "[s]tate law had nothing to do with 'the nature and circumstances' of Weyker's conduct." 39 F.4th at 1090.

  <u>In this case</u>, new allegations and documents—not presented in *Yassin*—prove that all of Weyker's conduct was driven by her St.

---

[9] Mohamud presents not only a different story but a fuller one. Yassin's complaint provided only about 10 pages of factual allegations; Mohamud's Second Amended Complaint provides about 25, plus another 40 pages of exhibits supporting and detailing those allegations.

Paul-assignment. That assignment was to lead an investigation to "combat . . . human trafficking when it appears in Minnesota" through the "Gerald D. Vick Human Trafficking Task Force of Minnesota"—a task force for which "[t]he Saint Paul Police Department (SPPD) is the lead agency":

**Gerald D. Vick Human Trafficking Task Force**

**Memorandum of Understanding**

**Mission Statement: The goals of the Gerald D. Vick Human Trafficking Task Force (Task Force) of Minnesota are to foster communication among local, state and federal law enforcement agencies working together with organizations providing comprehensive services to trafficking victims; identify and rescue victims of human trafficking; and combat domestic and international human trafficking when it appears in Minnesota.**

The Saint Paul Police Department (SPPD) is the lead agency in the establishment and continuance of the Human Trafficking Task Force (HTTF). Each member agency agrees to support the overall mission of the HTTF to identify and assist victims of human trafficking and to proactively investigate, identify, apprehend and prosecute the perpetrators of human trafficking while using a victim centered approach. Each member understands that this MOU is not an agreement to enter into a financial arrangement with the other members, as no funding sources will be shared. The Saint Paul Police Department receives funding from the Bureau of Justice Assistance, U.S. Department of Justice and Breaking Free receives funding from the Office of Justice Programs in the Office for Victims of Crime, U.S. Department of Justice.

In order to facilitate the goals of the Mission Statement, the core member agencies agree to and including, but not limited to, the following participation:

App. 59; R. Doc. 76, at 35.

- In *Yassin,* the Court explained that "the witness [Weyker] was trying to protect, Muna Abdulkadir, was only on her radar because she was assigned to a federal investigation." 39 F.4th

at 1090. Indeed, Yassin's complaint did not state otherwise. Nor did Yassin explain that Weyker's investigation gained a federal dimension only after Weyker began cultivating Abdulkadir. *Contra* App. 45–46; R. Doc. 76, at 21–22.

In this case, new allegations and documents prove that "Weyker met Muna Abdulkadir in 2009 [before there was any ostensible federal investigation or cross-deputization] and began to cultivate her as a witness for the St. Paul Police Department." App. 45; R. Doc. 76, at 21.

---

Saint Paul Police Department

Page 1 of 9

## SUPPLEMENTAL OFFENSE / INCIDENT REPORT

| Complaint Number | Reference CN | Date and Time of Report |
|---|---|---|
| )044622 | | 11/01/2009 16:50:00 |

Primary offense:
INVESTIGATE-AND ALL OTHER

---

Primary Reporting Officer: Weyker, Heather L

Primary squad:

Secondary reporting officer:

Approver:

District: Eastern

Site:

Name of location/business:

Location of incident: 367 GROVE ST

ST PAUL, MN 55101

Date & time of occurrence: 03/13/2008 21:10:00 to

03/13/2008 21:10:00

Arrest made:

Secondary offense:

---

Police Officer Assaulted or Injured:

Crime Scene Processed:

Police Officer Assisted Suicide:

---

**NARRATIVE**

On 10-26-09, I, Ofcr Heather Weyker, Sgt John Bandemer, FBI S/A Nick Pottratz responded to 8660 Franlo Road, Eden Prairie, MN 55344, to speak with Muna Mohamud Abdulkadir, (known throughout report at Muna) ▇-93, SS# ▇-4315, and to serve her with a grand jury subpoena for 11-04-09. Note on her SS card it read Muna Abduqadir. Muna stated they spelled her name wrong on the SS card, but the number was what she used.

36

App. 170; R. Doc. 81-2, at 89. Mohamud has also shown that, the same year, the Vick Task Force asked the Minnesota U.S. Attorney to bring federal charges in the *Adan* cases, but he declined to do so because the evidence "supported a state prosecution, but not a federal case." App. 45; R. Doc. 76, at 21.

- In <u>*Yassin*</u>, the Court found that Weyker "did not stray from the 'performance of [her] official duties' when she spoke to Officer Beeks and his supervising officer" but that "Weyker's work on the federal sex-trafficking investigation led to Yassin's arrest[.]" 39 F.4th at 1090–91.

  <u>In this case</u>, new allegations and documents prove that Weyker relied on her state-law position and authority to convince Beeks to arrest Mohamud for a Minnesota crime. Mohamud's new allegations also make clear that the Vick Task Force is the "federally funded human trafficking task force" to which Weyker referred in her affidavit:

> ### AFFIDAVIT
>
> Your affiant is a Police Officer with the St. Paul Police Department and has been employed there for the last 12 years and is also Federal Bureau of Investigation Task Force Officer. Your affiant is currently assigned to the Vice Unit and is part of a federally funded human trafficking task force which investigates human trafficking crimes and other related crimes such as drugs, fraud and smuggling. On June 16, 2011, your affiant became involved in the investigation of an assault of a federal witness who will be referred to by her initials as M.A. in this affidavit. The facts known to me in this affidavit are derived from my participation in the investigation as well as information received by other officers and or federal agents.

App. 49; R. Doc. 76, at 25; App. 128–68; R. Doc. 81-2, at 47–87. The St. Paul Police Department led the Vick Task Force to advance a state-oriented mission. Because Weyker's federal authority was limited to "seek[ing] and execut[ing] arrest and search warrants supporting a federal task force," App. 47; R. Doc. 76, at 23, neither of which even arguably covered her actions in convincing Beeks to arrest Mohamud for a Minnesota crime, she relied on her state position and authority for those actions.

- In *Yassin*, the Court found that Weyker "acted within the scope of her federal duties while dealing with the situation." 39 F.4th at 1091.

In this case, new allegations and documents prove that the entire investigation was part of Weyker's local duties and was run by, through, and for the St. Paul Police Department. "At least ostensibly, all of Weyker's actions in her investigation leading up to the *Adan* cases and toward [Mohamud] . . . were intended to accomplish the state-oriented mission of the Vick Task Force: to 'combat domestic and international human trafficking when it appears in Minnesota.'" App. 49; R. Doc. 76, at 25; *see also* App. 57–62; R. Doc. 76, at 33–38. Mohamud also specifically alleges that she was arrested only because Weyker used her state credentials and specialized knowledge of local policing. App. 40–42; R. Doc. 76, at 16–18.

- In *Yassin*, the Court did not have any task force agreements confirming that (1) Weyker was working through a St. Paul-led task force and (2) the St. Paul Police Department and federal government understood cross-deputized officers to act with state authority and as state actors when serving on a state-federal task force.

<u>In this case</u>, the Court has these documents. The Vick Task Force memorandum establishes the state nature of Weyker's investigation. *See* App. 59; R. Doc. 76, at 35. Two other memoranda show a custom between the St. Paul Police Department and federal government that cross-deputized officers exercise state authority and are state actors.

*2005 Joint Terrorism Task Force*

Liability for violations of federal constitutional law rests with the individual federal agent or officer pursuant to <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,</u> 403 U.S. 388 (1971) or pursuant to 42 U.S.C. Section 1983 for state and local officers or cross-deputized federal officers.

*2011 Cyber Crime Task Force*

<u>Bivens Actions.</u> Liability for violations of federal constitutional law rests with the individual Federal agent or officer, or employee, pursuant to <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,</u> 403 U.S. 388 (1971) or pursuant to 42 U.S.C. § 1983 for State and local officers or cross-deputized Federal officers.

App. 67, 97; R. Doc. 76, at 43, 73. (Courts have cited such task-force-agreement language to permit Section 1983 claims to proceed.[10])

---

[10] *Boes v. Metzinger*, No. CIV.08-4180, 2010 WL 11681453, at *4–6 (D.S.D. July 12, 2010):

[T]he Memorandum of Understanding provided that "[l]iability for violations of federal constitutional law rests with the individual federal agent or officer pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) or

<center>*     *     *</center>

Despite being denied any discovery, Mohamud has supplied a far more detailed and dramatically different factual picture of Weyker's actions than this Court viewed in *Yassin*. The different facts produce a different outcome because *Yassin* did not hold that cross-deputization precludes color of state law. Rather, color of state law depends on the "relationship between [Weyker's] conduct and [her] duties as a [St. Paul] police officer." *Yassin*, 39 F.4th at 1091. Mohamud has shown that relationship exists here.

## II. The circuits are split over whether cross-deputized state-federal task force members can act under color of state law.

Consistent with *Yassin*'s reasoning, several circuit courts have held that federal officers can act under color of state law.[11] For instance, in

---

pursuant to 42 U.S.C. Section 1983 for state and local officers or cross-deputized federal officers."

*See also Van Loo v. United States*, No. 3:23-CV-05618, 2024 WL 3082357, at *4, *13 (June 5, 2024).

[11] *E.g.*, *Big Cats of Serenity Springs, Inc. v. Rhodes*, 843 F.3d 853, 869–71 (10th Cir. 2016); *Hindes v. FDIC*, 137 F.3d 148, 158 (3d Cir. 1998); *Strickland v. Shalala*, 123 F.3d 863, 866 (6th Cir. 1997); *Cabrera v. Martin*, 973 F.2d 735, 742–44 (9th Cir. 1992); *Olson v. Norman*, 830 F.2d 811, 821 (8th Cir. 1987); *Knights of the KKK v. E. Baton Rouge Par. Sch. Bd.*, 735 F.2d 895, 899–900 (5th Cir. 1984); *Hampton v. Hanrahan*, 600 F.2d

<center></center>

*Kletschka v. Driver*, the Second Circuit explained: "We can see no reason why a joint conspiracy between federal and state officials should not carry the same consequences under § 1983 as does joint action by state officials and private persons." 411 F.2d 436, 448–49 (2d Cir. 1969); *see also NeSmith v. Fulton*, 615 F.2d 196, 199 (5th Cir. 1980) ("It is true that a [national guard] adjutant general is *at least in part* a state officer" but that "does not preclude his simultaneously being a federal agency." (emphasis added)).

On the specific question of whether cross-deputized members of state-federal task forces can act under color of state law, the circuits are divided.

**A.    Several circuits have confirmed that state officers on task forces can act under color of state law.**

At least two circuits have aligned with *Yassin*'s reasoning and held that cross-deputized task force officers may act under state law, federal law, or both. *Couden v. Duffy*, 446 F.3d 483 (3d Cir. 2006); *Askew v. Bloemker*, 548 F.2d 673 (7th Cir. 1976); *cf. Bressi v. Ford*, 575 F.3d 891

---

600, 623 (7th Cir. 1979), *overruled in part on other grounds*, 446 U.S. 754 (1980); *Kletschka v. Driver*, 411 F.2d 436, 448–49 (2d Cir. 1969).

(9th Cir. 2009) (tribal law).[12, 13] These circuits look beyond the label and consider the circumstances of a task force officer's conduct to determine color of law. *Accord Lindke v. Freed*, 601 U.S. 187, 197 (2024) (explaining state-action analysis "turns on substance, not labels" and, therefore, "can require a close look").

In *Couden v. Duffy*, for instance, the Third Circuit held that Delaware police officers working on a task force were acting under color of state law because the fugitive they arrested was wanted by local police and—as here—the investigation was initiated locally. 446 F.3d 483, 489, 499 (3d Cir. 2006). Accordingly, the task force officers were subject to claims under Section 1983. *Id.* at 499. *Accord Johnson v. Orr*, 780 F.2d 386, 390 (3d Cir. 1986).

---

[12] In *Bressi*, the Ninth Circuit noted that "tribal officers who are authorized to enforce state as well as tribal law, and proceed to exercise both powers . . . , will be held to constitutional standards [under Section 1983.]" 575 F.3d at 897–98.

[13] A number of district courts have also held that cross-deputized officers can act under color of state law. *E.g.*, *Van Loo*, 2024 WL 3082357, at *3–6 (distinguishing *Yassin* at length); *Deavers v. Martin*, No. 2:21-CV-00423, 2022 WL 551262, at *6–7 (S.D. W. Va. Feb. 23, 2022); *McLeod v. United States*, No. 1:20-CV-00595, 2021 WL 5906373, at *5–8 (S.D. Ala. Dec. 14, 2021); *Hayes v. Dye*, No. CIV.2008-165, 2010 WL 3515578, at *2 n.1 (E.D. Ky. Sept. 2, 2010); *Boes*, 2010 WL 11681453, at *4–6; *Martin v. Ind. State Police*, 537 F. Supp. 2d 974, 987 (S.D. Ind. 2008).

In the Seventh Circuit, too, "the totality of the circumstances surrounding the alleged" actions governs whether task force members act "pursuant to federal authority [or] under color of any state law." *Askew*, 548 F.2d at 677. In *Askew*, the court considered whether St. Louis, Missouri, police officers could be sued under Section 1983 for their raid of a home in Illinois as members of a state-federal task force. Although the court concluded that the officers were acting only under color of federal law, it did so by considering the undisputed facts in the pleadings and those elicited through discovery. The Seventh Circuit emphasized that the actions of the state officers were taken "pursuant solely to federal authority" because—unlike Weyker in Minnesota—the officers in *Askew* had no authority under color of Missouri law to raid a home in Illinois. *Id.* at 677.

**B.** **Other circuits are wrong to have applied a categorical rule that cross-deputized officers act under the exclusive color of federal law.**

Circuits have come out the other way too, finding that the existence of *any* federal authority precludes color of state law. In these courts,

cross-deputization for task force work effectively places state and local police beyond the reach of Section 1983.[14]

For example, the Sixth Circuit held in *King v. United States* that a cross-deputized state officer "carrie[s] federal authority and act[s] under color of that authority rather than under any state authority[.]" 917 F.3d 409, 433 (6th Cir. 2019). There, the court spared a local officer liability under Section 1983 for brutally beating an innocent college student in pursuit of a state suspect. *Id.* at 416–18, 433; *see also id.* at 434 ("Plaintiff's claims against [the detective] are *Bivens* claims and not § 1983 claims.").[15]

_____

[14] *Jakuttis v. Town of Dracut,* 95 F.4th 22, 29–30 (1st Cir. 2024) (shielding officer from liability because conduct was "related to" task force duties); *King v. United States*, 917 F.3d 409, 433 (6th Cir. 2019), *rev'd on other grounds sub nom. Brownback v. King*, 592 U.S. 209 (2021); *Guerrero v. Scarazzini*, 274 F. App'x 11, 12 n.1 (2d Cir. 2008) (summary order) ("[B]ecause Scarazzini and McAllister were federally deputized for their Task Force work, this claim was properly brought . . . as a *Bivens* action"). *Cf. Logsdon v. U.S. Marshal Serv.*, 91 F.4th 1352, 1358 (10th Cir. 2024) (stating in the analysis of a *Bivens* claim that cross-deputized task force officers "act under color of federal law when acting in that capacity"); *DeMayo v. Nugent*, 517 F.3d 11, 14 n.5 (1st Cir. 2008).

[15] The Sixth Circuit issued *King* before the Supreme Court severely restricted the availability of *Bivens* in *Egbert v. Boule*, 596 U.S. 482 (2022). As a result, *King* explicitly provided that the distinction between Section 1983 and *Bivens* was immaterial: "Detective Allen's potential liability is unchanged by whether Plaintiff's claims properly arise under *Bivens* or

### C. This Court's decision in *Yassin* rests on facts beyond Weyker's cross-deputization.

While *Yassin* cites *King* with approval, 39 F.4th at 1091, *Yassin* nowhere holds that a cross-deputized officer cannot act under color of state and federal law simultaneously. If that's the law in this circuit, this Court should say so, but *Yassin*'s analysis suggests the opposite. For instance, the Court saw no "actual or purported relationship between [Weyker's] conduct and [her] duties as a [St. Paul] police officer." *Yassin*, 39 F.4th at 1091. The Court reasoned that "[s]tate law had nothing to do with 'the nature and circumstances' of Weyker's conduct"; that "the witness she was trying to protect, Muna Abdulkadir, was only on her radar because she was assigned to a federal investigation"; that Weyker "did not stray from the 'performance of [her] official duties' when she spoke to Officer Beeks and his supervising officer"; and that Weyker's "local practices" played an incidental role in her conduct. *Id.* at 1090–91.

---

§ 1983." 917 F.3d at 433 n.10. Accordingly, the Sixth Circuit treated the Section 1983 question as inconsequential. But in this case the question is dispositive because this Court has already held that Officer Weyker cannot be sued under *Bivens*. *Ahmed*, 984 F.3d at 565. The same will be true for many—if not most—cases after *Egbert*.

In other words, *Yassin*'s reasoning acknowledges that a cross-deputized officer *can* act under color of state law. The allegations of Yassin's complaint simply did not show the relationship between state authority and Weyker's conduct. Mohamud's Second Amended Complaint, however, paints a dramatically different picture than the one in *Yassin*. On Mohamud's facts, Weyker acted under color of state law.

### III.  A person acts under color of state law when her actions are fairly attributable to the state.

Only the total absence of state color insulates a person from Section 1983. Parallel authority—*e.g.*, private, tribal, or federal—does not erase state color. *See, e.g.*, *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722–26 (1961) (Private: state color even though discrimination by a private restaurant); *Evans v. McKay*, 869 F.2d 1341, 1348 (9th Cir. 1989) (Tribal: state color even though "law enforcement officers may be said to have been acting pursuant to Tribal Court orders"); *Lake Country Ests., Inc. v. Tahoe Reg'l Plan. Agency*, 440 U.S. 391, 399–400 & n.13 (1979) (Federal: state color "even though [the acts] required federal approval").

That's because Section 1983 is a remedial statute that was passed "in aid of the preservation of human liberty and human rights." *Lake Country*, 440 U.S. at 400 n.17 (quotation omitted). The statute provides

broad-reaching liability against "[e]very person" who violates the Constitution "under color of *any* statute, ordinance, regulation, custom, or usage, of any State[.]" 42 U.S.C. § 1983 (emphasis added). And the Supreme Court has observed as "well settled that § 1983 must be given a liberal construction[.]" *Lake Country*, 440 U.S. at 399–400. It is not limited to violations committed "under the *exclusive* color" of state law or "under the *primary* color" of state law. *See, e.g.*, *Monroe v. Pape*, 365 U.S. 167, 172 (1961) (holding that state color extends even to acts for which a state officer "can show no authority under state law, state custom, or state usage for what he did"). The upshot is simple: If there's *any* state color, Section 1983 provides a cause of action against an official who acted under it. *See West v. Atkins*, 487 U.S. 42, 51 (1988) (finding sufficient that there was "close cooperation and coordination" with the state and "joint effort").

To act "under color of" state law, a person must "have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Id.* at 49 (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). The question is whether conduct is "fairly attributable to the State." *Yassin*, 39 F.4th at

1090 (quoting *Montano v. Hedgepeth*, 120 F.3d 844, 848 (8th Cir. 1997)).

Two factors guide this often-fact-bound inquiry:

> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible.

And:

> Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State.

*Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 937 (1982); *see also id.* at 939.

> Weyker's conduct satisfies both factors.[16]

---

[16] Alternatively—though inconsistent with *Yassin*—Officer Weyker's asserted position as a St. Paul police officer, *see, e.g.*, App. 35–36; R. Doc. 76, at 11–12, alone should establish state color. Citing the acts of local police like Weyker, the Supreme Court has explained that the two *Lugar* factors "collapse into each other when the claim of a constitutional deprivation is directed against a party whose official character is such as to lend the weight of the State to his decisions." *Lugar*, 457 U.S. at 937 (citing *Monroe*, 365 U.S. at 172). As a result, "state employment is generally sufficient to render the defendant a state actor." *Montano*, 120 F.3d at 848 (quoting *Lugar*, 457 U.S. at 935 n.18).

To this point, we have not found a single case since the enactment of Section 1983 in which the Supreme Court held that a local police officer's actions fell beyond state color. As the Court explained in *Griffin v.*

## A. Weyker exercised a right or privilege sourced in state authority when she framed Mohamud.

Under the first *Lugar* factor, a state police officer like Weyker exercises a right or privilege sourced in state authority when there is a "sufficient nexus" between her state duties and harmful conduct. *Ramirez-Peyro v. Holder*, 574 F.3d 893, 900 (8th Cir. 2009). Considerations include whether she was on duty, the motivation behind her actions, and whether she had access to the victim because of her position. *Magee v. Trustees of Hamline Univ.*, 747 F.3d 532, 535 (8th Cir. 2014); *see also Monroe*, 365 U.S. at 168–69. Agency documents—like the memoranda here—can facilitate this analysis. *West*, 487 U.S. at 51 (discussing an internal manual and written standards as evidence of a cooperative relationship with state authority).

---

*Maryland*, 378 U.S. 130, 135 (1964), ascribing state color to an off-duty deputy sheriff working as private security:

> If an individual is possessed of state authority and purports to act under that authority, his action is state action. It is irrelevant that he might have taken the same action had he acted in a purely private capacity or that the particular action which he took was not authorized by state law.

At minimum, there should be presumptive state color when the defendant is a state police officer. We preserve this argument for possible en banc consideration and certiorari.

Weyker's state duties and state authority were directly connected to her injurious conduct here. "OFFICER HEATHER WEYKER 710 out of St. Paul" held herself out as a local officer to intervene in a local investigation. App. 32; R. Doc. 76, at 8. She was motivated to protect a witness she began cultivating in 2009, when she was exclusively a St. Paul police officer. App. 45; R. Doc. 76, at 21; *see also* App. 110–11; R. Doc. 81, at 7–8; App. 128–168; R. Doc. 81-2, at 47–87. She believed she was furthering the *Adan* investigation, which the St. Paul Police Department assigned her to develop on the Vick Task Force of Minnesota. App. 43–50; R. Doc. 76, at 19–26; *see also* App. 144; R. Doc. 81–2, at 63 (showing "Officer Heather Weyker [was] . . . assigned as the full time trafficking investigator" on the Vick Task Force). And, as Mohamud recently learned, the Vick Task Force of Minnesota was led by the St. Paul Police Department—not any federal agency. App. 43–45, 57–62; R. Doc. 76, at 19–21, 33–38.

Perhaps most importantly, Weyker's status as a St. Paul officer enabled her to reach officers on the scene and cause Mohamud's arrest. App. 33; R. Doc. 76, at 9; *see also United States v. Colbert*, 172 F.3d 594, 597 (8th Cir. 1999) (noting as evidence of state color that the defendant's "status as a police officer enable[d] him to be in the restricted area of the jail,

and to open [the victim's] cell"). Mohamud's rights would not have been violated "but for Weyker holding herself out as a St. Paul police officer[.]" App. 42; R. Doc. 76, at 18.

Cross-deputization did not remove Weyker's state authority. Even in her affidavit charging Mohamud with federal crimes, Weyker purported to perform her St. Paul duties. *See* App. 49; R. Doc. 76, at 25; *see also* App. 41; R. Doc. 76, at 17. Weyker was "assigned to the Vice Unit [of the St. Paul Police Department] and . . . part of a federally funded human trafficking task force [the Vick Task Force of Minnesota.]" App. 49; R. Doc. 76, at 25. Thus, even with a limited grant of federal authority, Weyker advanced the interests of the St. Paul-led task force to which the St. Paul Police Department had assigned her, as a St. Paul police officer, with the goal of "combat[ing] . . . human trafficking when it appears in Minnesota." App. 59; R. Doc. 76, at 35. The state character of Weyker's investigation did not disappear when federal reinforcements arrived or because she gained federal authority "[t]o seek and execute arrest and search warrants supporting a federal task force." App. 46–47; R. Doc. 76, at 22–23.

The Supreme Court has held that acts with their roots in state color do not lose that character simply because the federal government gets involved. *Lake Country*, 440 U.S. at 399 & n.13 (citing as evidence of state character that "[t]he [Congressionally approved interstate] Compact had its genesis in the actions of the compacting States"). And this Court has explained in an analogous context that a state investigation does not shed its state character when private interests later take hold. *Smith v. Insley's Inc.*, 499 F.3d 875, 880 (8th Cir. 2007) (holding that a vehicle towed and stored as part of a criminal investigation was sold under state color because the sale was the "result of the initial criminal investigation tow").

Taken together, the facts here establish that Weyker "put the weight of the State behind" her gambit to frame Mohamud. *Lugar*, 457 U.S. at 940. Notwithstanding any parallel federal authority gained through cross-deputization, Weyker exercised power "possessed by virtue of state law and made possible only because [she was] clothed with the authority of state law." *West*, 487 U.S. at 49 (citation omitted).

The first *Lugar* factor is satisfied.

**B.      Weyker is a state actor in three ways.**

Turning to the second *Lugar* factor, a person can be a state actor in at least three circumstances: (1) if she performs a traditional public function, using a power traditionally reserved to the state; (2) if she participates in a joint activity with the state or its agents; or (3) if there is pervasive entwinement between the party and the state. *Wickersham v. City of Columbia*, 481 F.3d 591, 597 (8th Cir. 2007); *see also Roberson v. Dakota Boys & Girls Ranch*, 42 F.4th 924, 929 (8th Cir. 2022). While only one is required, all three describe Weyker.

**1.      Weyker exercised power traditionally reserved to the state.[17]**

Weyker exercised two powers traditionally reserved to the state. *First*, Weyker used communication systems generally reserved for state law-enforcement officers. App. 32–33; R. Doc. 76, at 8–9. People who are not state police officers cannot generally use local departments' internal

---

[17] Yassin did not argue that Weyker exercised powers traditionally reserved to the state. *See* Br. of Appellant at 32–50, *Yassin v. Weyker*, 39 F.4th 1086 (8th Cir. 2022) (No. 20-3299); *Ivey v. Audrain County*, 968 F.3d 845, 851 (8th Cir. 2020) ("The principle of party presentation counsels against adopting theories of a plaintiff's case that he does not advance[.]").

communications systems to connect with local law enforcement officers at an active crime scene. But Weyker could and did leverage her position as a St. Paul officer to swiftly intercede in the Minneapolis officers' investigation. Mohamud has alleged that she would not have been arrested but for Weyker's invocation of her state authority and knowledge of local policing. App. 40–42; R. Doc. 76, at 16–18. Thus, Weyker "abuse[d] the position given to [her] by the State." *Ramirez-Peyro*, 574 F.3d at 900 (citation omitted); *cf. Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 621–22 (1991) (listing factors establishing state-actor status, including "whether the injury caused is aggravated in a unique way by the incidents of governmental authority").

*Second*, Weyker exercised the power to investigate state crimes and decide whether a person should be detained for them. *See Doe v. N. Homes, Inc.*, 11 F.4th 633, 637 (8th Cir. 2021). Weyker used her state-law credentials and know-how to inject herself into a state-law investigation and persuaded on-scene local officers to arrest Mohamud for the Minnesota crime of witness tampering. True, the federal government also has the power to investigate crimes. But the investigation into which Weyker intruded was not federal. It was a state-law investigation into a

knife attack. Weyker fed Minneapolis officers information that would persuade them to arrest Mohamud and her friends for violating state law—something both Weyker and the on-scene officers could do as local police officers. Sure enough, Beeks arrested Mohamud and her friends for a state-law crime. App. 40; R. Doc. 76, at 16.

> ### 2. Weyker's investigation became a joint activity between the St. Paul Police Department and federal government.

The second reason Weyker is a state actor is that she was "a willful participant in joint activity with the State or its agents[.]" *Murray v. Wal-Mart, Inc.*, 874 F.2d 555, 558–59 (8th Cir. 1989). Joint activity rests on a "symbiotic relationship" between the state and another entity. *Cabrera v. Martin*, 973 F.2d 735, 742 (9th Cir. 1992). The test "is whether the state or its officials played a 'significant' role" in the injury. *Kletschka v. Driver*, 411 F.2d 436, 449 (2d Cir. 1969); *see also Burton*, 365 U.S. at 722–26 (public building, private restaurant). For example, private businesses and their employees act under color of state law when police detain accused shoplifters without making an independent investigation or when an accused shoplifter is detained based on a customary plan between the store and police department. *See Murray*, 874 F.2d at 559. Similarly,

Veteran Affairs hospital administrators and doctors are state actors when they work "in close cooperation" with a state medical school to violate someone's rights. *Kletschka*, 411 F.2d at 440.

Cases addressing joint action often involve agents who are strictly state actors working in concert with strictly private or strictly federal actors. That was the case in *Martinez v. Winner*, 771 F.2d 424 (10th Cir. 1985), where exclusively federal prosecutors conspired with exclusively state officers to subject a man to a rigged criminal process. In doing so, the federal agents opened themselves up to liability under Section 1983; they were appropriately characterized as state actors in their conspiratorial acts. *See id.* at 441.

Sometimes, though, the ingredients of joint action are less well delineated, making state action even more likely to exist. That was the situation in *Murray v. Wal-Mart*. Wal-Mart's private security guard called police after detaining a shoplifter. Police took the suspect into custody, and the prosecutor pressed charges based on the security guard's "incomplete version of the facts." 874 F.2d at 559. Though a private employee for Wal-Mart, the security guard was also employed by the local police department and, as a result, had a close relationship with the prosecutor.

This Court had little trouble concluding that Wal-Mart was a state actor based on joint action. *Id.*

Weyker similarly embodied joint action. The St. Paul Police Department and federal government entered a "'symbiotic' venture" through task-force collaboration and by cross-deputizing Weyker. *See Big Cats of Serenity Springs, Inc. v. Rhodes,* 843 F.3d 853, 869–71 (10th Cir. 2016). Not only did state and federal officers come together on the Vick Task Force of Minnesota to further the *Adan* cases, but Weyker was joint action personified. Equipped with both state and federal privileges, she carried out an unconstitutional plan to frame Mohamud to protect a joint state-federal venture that was led by the state. And any joint venture with the state carries color of state law. *Cf. Griffin v. Maryland,* 378 U.S. 130, 135 (1964) ("It is irrelevant that he might have taken the same action had he acted in a purely private capacity[.]").

To be clear, it is not as if joint action exists because a federal officer (Weyker) conspired with a state officer (Beeks or Manty). Weyker was not *just* a federal officer. Consistent with the very premise of cross-deputization, Weyker was both a state and federal officer who could carry out joint state-federal action all on her own. What's more, she was eligible for

cross-deputization only through her preexisting status as a state actor. 28 C.F.R. § 0.112. For that reason alone, any color of federal law cannot eclipse the state law under which Weyker simultaneously acted. *Cf. Lake Country*, 440 U.S. at 399–400 (*e.g.*, "The Court of Appeals incorrectly assumed that the requirement of federal approval of the interstate Compact foreclosed the possibility that the conduct of [the] officers could be found to be 'under color of state law' within the meaning of § 1983."); *Johnson*, 780 F.2d at 392 ("[W]hile the adjutant general acted as a federal agent in [the injurious conduct], it does not follow that his actions were done exclusively under color of federal law." (citation omitted)).[18]

### 3. The Vick Task Force pervasively entwined Weyker's work on the *Adan* cases with the state.

The third reason Weyker is a state actor is that the state was pervasively entwined with Weyker's task-force work. The pervasive-entwinement doctrine recognizes that the state is responsible for unconstitutional actions when it has played a large enough role in the

---

[18] Yassin did not make this joint-action argument; nor did she cite *Murray v. Wal-Mart*. Yassin's only joint-action theory was that Weyker ("the purported non-state actor") acted jointly with state official Sergeant Manty. Br. of Appellant, *supra* note 17, at 38–41. This Court rejected that argument. *See Yassin*, 39 F.4th at 1091 n.3.

"composition and workings" of an actor. *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 298 (2001).

In one iteration of the doctrine, "[c]onduct that is formally 'private' may become . . . so impregnated with a government character as to become subject to the constitutional limitations placed upon state action." *Evans v. Newton*, 382 U.S. 296, 299 (1966). Thus, the Supreme Court determined that a nonprofit athletic association was a state actor because it drew many of its members from public schools and many of its employees were eligible to enroll in the state retirement system. *Brentwood*, 531 U.S. at 298–300. Similarly, the Court determined that private trustees of a park were state actors because the park had a history of municipal control, and it maintained many of the public features it had before passing into private hands. *Evans*, 382 U.S. at 299. The Court reasoned that it "cannot take judicial notice that the mere substitution of trustees [from public to private] instantly transferred th[e] park from the public to the private sector." *Id.* at 301.

The pervasive-entwinement doctrine also applies to an actor who is federal, but whose activities are intertwined with state law. For example, several courts have confronted a situation in which a statute made

National Guard technicians federal employees. *See, e.g.*, *Johnson*, 780 F.2d at 391. The courts agreed that the technicians' federal dimension did not prevent liability under Section 1983. *Id.* (collecting cases). As the Third Circuit explained, the statute did not render technician supervisors and the adjutant general "more federal in character to the point where [they] can no longer be considered as acting under color of state law . . . ." *Id.*; *cf. Kletschka*, 411 F.2d at 449 (paraphrasing *Burton*, 365 U.S. at 725, to hold that a state medical center "has so far insinuated itself into a position of interdependence with" a VA hospital that the hospital "cannot be considered to have been so purely federal as to fall without the scope of the Fourteenth Amendment." (cleaned up)).

So too here. Weyker did not cease to be a state actor when she gained (limited) federal authority. App. 45–47; R. Doc. 76, at 21–23. Nor did the Vick Task Force of Minnesota cease to be a St. Paul-led endeavor. App. 43–44, 49–50; R. Doc. 76, at 19–20, 25–26. Nor did the investigation into the *Adan* cases—which maintained a predominantly Minnesota focus—transform into a purely federal matter after criminal charges eventually emerged. *Id.* To emphasize this point, the Minnesota U.S. Attorney

did not bring federal charges because the evidence "supported a state prosecution, but not a federal case."[19] App. 45; R. Doc. 76, at 21.

The state's continued interest in the investigation after Weyker's cross-deputization is not speculative. The state endorsed Weyker's cross deputization, and the other federal agencies simply joined the St. Paul-led Vick Task Force to further the Minnesota investigation that Weyker had been leading for years. App. 45–47; R. Doc. 76, at 21–23. Stated another way, Weyker's cross-deputization and the increased federal participation in the Vick Task Force did not "instantly transfer[]" the state's historical and continuing control over Weyker or her investigation to the federal government. *Evans*, 382 U.S. at 301. Weyker cannot escape her state color simply because the state tapped the federal government for more reinforcement and cross-deputization. Indeed, her federal authority to seek and execute warrants was a minimal addition to her role as a state officer on the task force. App. 47; R. Doc. 76, at 23. And as the newly

_____

[19] Yassin did not make this pervasive-entwinement argument. She argued only that Weyker injected herself into the state investigation of Abdulkadir's attack on Mohamud and her friends. *See* Reply Br. of Appellant at 23–25, *Yassin v. Weyker*, 39 F.4th 1086 (8th Cir. 2022) (No. 20-3299). Nor did Yassin present the fact that the U.S. Attorney refused to bring federal charges because the facts supported only a state prosecution.

discovered memoranda of understanding confirm, everyone thought Weyker acted with state authority and as a state actor, even after her cross-deputization:

> Bivens Actions. Liability for violations of federal constitutional law rests with the individual Federal agent or officer, or employee, pursuant to Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971) or pursuant to 42 U.S.C. § 1983 for State and local officers or cross-deputized Federal officers.

App. 97; R. Doc. 76, at 73; *see also* App. 67; R. Doc. 76, at 43.

Thus, Weyker is appropriately characterized as a state actor in three independent ways.

<p style="text-align:center">*    *    *</p>

The Supreme Court has confirmed that federal officials can act under color of state law. Take for instance *Lake Country*.[20] There, Lake Tahoe property owners brought claims under Section 1983 and *Bivens* against officers of the Tahoe Regional Planning Agency—a body created by congressional compact. *Lake Country*, 440 U.S. at 393–94. The officers argued that congressional approval precluded their acts from being under color of state law, and the Ninth Circuit agreed. *See id.* at 396.

---

[20] The parties in *Yassin* did not cite or discuss *Lake Country*.

The Supreme Court rejected the Ninth Circuit's conclusion "that the requirement of federal approval of [an] interstate Compact foreclosed the possibility that . . . officers could be found to be 'under color of state law[.]'" *Lake Country*, 440 U.S. at 399. The Court added, "Even if it were not well settled that § 1983 must be given a liberal construction, these facts adequately characterize the alleged actions of the respondents as 'under color of state law' within the meaning of that statute." *Id.* at 399–400 (footnote omitted). Of particular relevance to cross-deputized officers, *Lake Country* recognizes that, regardless of whether a *Bivens* remedy is available, Section 1983 provides a remedy when state *and* federal color are implicated. *See id.* at 400 (noting "no need to address the question whether there is an implied remedy [under *Bivens*]" because color of state law permitted claims under Section 1983).

Without addressing any of these arguments below, the district court simply cited *Yassin* and concluded, "Mohamud's assertion that Weyker acted under color of both state and federal law is not well founded[.]" App. 228 (citing *Yassin*, 39 F.4th at 1088–89, 1091 n.3); R. Doc. 90, at 17. But if an official acting under a federal compact can simultaneously act under color of state and federal law, so too can a cross-deputized St. Paul police

officer. A compact approved by a majority of Congress (*Lake Country*) affords more federal imprimatur than a one-page form approved by the sponsorship of a single FBI agent (this case). *Cf. Screws v. United States*, 325 U.S. 91, 110 (1945) (precluding a state from "annul[ing] or . . . evad[ing]" "constitutional prohibition[s]" by ostensibly limiting the power of state officers).

## IV. The district court erred by dismissing this case and abused its discretion by denying Mohamud any discovery.

Under either Rule 12 or Rule 56, Mohamud's case must be allowed to proceed. This Court reviews de novo both the district court's denial of leave to amend for futility and grant of summary judgment. *Doe v. Dardanelle Sch. Dist.*, 928 F.3d 722, 727 (8th Cir. 2019) (leave to amend); *Ray v. Am. Airlines, Inc.*, 609 F.3d 917, 924 (8th Cir. 2010) (summary judgment). Both require the courts to take the facts as Mohamud has alleged and documented them. *Id.*

Because amendment was denied for futility, the Rule 12(b)(6) standard applies to Mohamud's Second Amended Complaint. *Dardanelle*, 928 F.3d at 727. Amendment should have been permitted so long as Mohamud's allegations and exhibits provided "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). As discussed above, they did.

Similarly, the district court's grant of summary judgment is inappropriate unless "the record shows that there was no genuine issue of material fact and the prevailing party was entitled to judgment as a matter of law." *Ray*, 609 F.3d at 924; *see also* Fed. R. Civ. P. 56(a). Here, that record includes the Second Amended Complaint, its exhibits, and the Declaration supporting Mohamud's request for limited discovery under Rule 56(d). A court must view the facts therein in the light most favorable to the nonmoving party, *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009), and draw all justifiable inferences from the evidence in her favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Although the district court never specified which facts or inferences it considered beyond the pleadings, the facts viewed in Mohamud's favor establish meritorious claims for the reasons above.[21]

---

[21] The district court explicitly declined to consider Officer Weyker's arguments regarding preclusion and renewed arguments regarding qualified immunity, App 236; R. Doc. 90, at 25, so those arguments are not properly before this Court. *See Sanzone v. Mercy Health*, 954 F.3d 1031, 1047 (8th Cir. 2020) ("When a district court fails to address a matter properly presented to it, we ordinarily remand to give the court an opportunity to rule

At a minimum, there are genuine issues of fact. To flag one example, Weyker has submitted an affidavit and trial testimony from Beeks about what led him to arrest Mohamud. Yet Mohamud has never had the opportunity to examine Beeks—at trial, in discovery, or anywhere else. His credibility remains an unresolved question of fact. For summary judgment, the problem this creates is manifest, which is why, "[a]s a general rule, summary judgment is proper 'only after the nonmovant has had adequate time for discovery.'" *Iverson v. Johnson Gas Appliance Co.*, 172 F.3d 524, 530 (8th Cir. 1999) (quoting *In re TMJ Litig.*, 113 F.3d 1484, 1490 (8th Cir. 1997)).

To establish entitlement to discovery, Mohamud must show "(1) that [she] [has] set forth in affidavit form the specific facts that [she] hope[s] to elicit from further discovery, (2) that the facts sought exist, and (3) that these sought-after facts are essential to resist the summary judgment motion." *Toben v. Bridgestone Retail Operations, LLC*, 751 F.3d 888, 894–95 (8th Cir. 2014) (quotation marks omitted). She has done so

---

in the first instance." (quotation omitted)). In any event, these arguments are meritless for the reasons provided in Mohamud's memorandum opposing summary judgment, R. Doc. 80, at 42–46 (preclusion), 46–53 (qualified immunity).

in detail here, providing a thorough declaration supported by nine exhibits and a specific explanation of the discovery sought and why it is necessary. *See generally* App. 103–211; R. Docs. 81, 81-1, 81-2. As with Mohamud's other arguments, the district court simply quoted from Mohamud's declaration and concluded, without any analysis: "Mohamud has not demonstrated the requested discovery demonstrates that Weyker did not act or did not purport to act in the performance of Weyker's federal duties in 2011 in connection with the altercation involving Abdulkadir, Mohamud, and Mohamud's friends." App. 235; R. Doc. 90, at 24.

This ruling is an abuse of discretion. *Pony Comput., Inc. v. Equus Comput. Sys., Inc.*, 162 F.3d 991, 996 (8th Cir. 1998); *Toben*, 751 F.3d at 894. Although review of a Rule 56(d) denial is "highly deferential," *Yassin*, 39 F.4th at 1091, discretion "does not permit a district court to give no explanation for its decision." *United States v. Burrell*, 622 F.3d 961, 964 (8th Cir. 2010). A district court must show *how* it exercised discretion. *Burrell*, 622 F.3d at 964; *see also Clark v. Baka*, 593 F.3d 712, 715–16 (8th Cir. 2010). Here, the district court provides no explanation

whatever.[22] Even worse, the district court applied its unexplained decision to the wrong standard. The court found that Mohamud had not established the negative proposition that limited discovery would show "Weyker did not act or did not purport to act in the performance of . . . federal duties." App. 235; R. Doc. 90, at 24. But the relevant question for purposes of Section 1983 is whether Mohamud established the affirmative proposition that discovery would show Weyker acted or purported to act in the performance of state duties. Mohamud has done so.

---

[22] For this reason, it's impossible for Mohamud to more substantively challenge the ruling than by simply pointing again to her detailed and well-documented Declaration in support. App. 103–211; R. Docs. 81, 81-1, 81-2. The same arguments also indicate that the district court's failure to identify the facts on which it relied in granting summary judgment was a reversible abuse of discretion.

## Conclusion

As shown by Mohamud's allegations and evidence, Weyker acted under color of state law when she violated Mohamud's clearly established Fourth Amendment rights. Accordingly, the district court erred in denying Mohamud's motion for leave to amend and in granting Weyker summary judgment. At a minimum, the district court abused its discretion by denying Mohamud even limited discovery under Rule 56(d). This Court should reverse the district court's decision, allow Mohamud to amend her complaint, and permit Mohamud's meritorious constitutional claims to proceed.

Respectfully submitted on July 8, 2024,


/s/ Patrick Jaicomo

| | |
|---|---|
| Patrick Jaicomo | Anthony Sanders |
| Marie Miller | INSTITUTE FOR JUSTICE |
| Anya Bidwell | P.O. Box 315 |
| Dylan Moore | Lindstrom, MN 55045 |
| INSTITUTE FOR JUSTICE | (703) 682-9320 |
| 901 N. Glebe Rd., Ste. 900 | |
| Arlington, VA 22203 | |
| (703) 682-9320 | |

*Counsel for Plaintiff-Appellant*

## Certificate of Compliance

I hereby certify that Appellant Hamdi Mohamud's Brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,942 words, as calculated using the word-count function of Microsoft Word 365, including all text, headings, footnotes, and quotations.

I further certify that Appellant Hamdi Mohamud's Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirement of Fed. R. App. P. 32(a)(6), because this document has been prepared in the proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font.

/s/ Patrick Jaicomo
Patrick Jaicomo

## Certificate of Service

I hereby certify that on July 8, 2024, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system, and all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I further certify that Appellant Hamdi Mohamud's Brief and the Addendum have been scanned for viruses using Bitdefender Endpoint Security Tools (Product version 7.9.13.423; Security Content version 7.97077), and they are virus-free pursuant to Eighth Circuit Rule 28A(h)(2).

/s/ Patrick Jaicomo
Patrick Jaicomo